UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LIBERTY INSURANCE CORPORATION
and THE CINCINNATI INSURANCE
COMPANY, as Subrogees of the
INSUREDS as listed on SCHEDULE A

          Plaintiffs,                     Case No. 1:20-cv-12814

v.                                      Honorable Thomas L. Ludington
                                      United States District Judge

LSP PRODUCTS GROUP, INC.,

          Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

      This matter is before this Court upon a motion for summary judgment from Defendant LSP

Products Group, Inc., contesting the claims of Plaintiff Cincinnati Insurance Company

("Cincinnati"). ECF No. 18. For the reasons stated hereafter, Defendant's Motion will be granted,

all Cincinnati's claims against Defendant will be dismissed, and all Liberty's claims will remain.

**I.**

      This case involves damage to buildings on two separate parcels of real property, allegedly

caused by the failure of toilet-water supply lines that Defendant manufactured and sold. ECF No.

18 at PageID.538. This Court previously summarized the background of this case as follows:

      This lawsuit is advanced by two separate insurance companies: Liberty
Insurance Corporation and The Cincinnati Insurance Company. They allegedly
paid their insureds under separate insurance contracts for the failure of two separate
and discrete toilet supply lines, which were manufactured and purchased at
different times, installed by different installers at unique real properties owned by
two separate insureds in two different counties. See Schedule A to the Complaint,
attached here as Exhibit 1. Plaintiff Liberty Insurance Corporation ("Liberty")
alleges that its insured Marilyn Lewis ("Lewis") suffered a loss on July 15, 2016 in
Southfield, Oakland County, Michigan, and that Liberty Insurance Corporation

paid Lewis's claim in the amount of $24,720.65. Plaintiff, The Cincinnati Insurance Company ("Cincinnati") alleges that its insured Riverfront Medical Realty, LLC ("Riverfront"), suffered a loss on August 22, 2016 in Saginaw, Saginaw County, Michigan, and that Cincinnati paid Riverfront's claim in the amount of $296,456.61.

*Liberty Ins. v. LSP Prod. Grp.*, No. 1:20-CV-12814, 2021 WL 2024897, at *2 (E.D. Mich. May 21, 2021) (quoting ECF No. 9 at PageID.163–64).

## A.

On April 12, 2018, Plaintiffs sued Defendant in the First Judicial District Court of Nevada. ECF No. 19 at PageID.680; *see Allstate Fire and Cas. Ins. v. LSP Prods. Grp.*, No. 18 TRT 00015 1B (Nev. 1st Dist. Ct. filed Apr. 12, 2018). On August 6, 2018, the court granted Defendant's motion to dismiss for forum non conveniens, dismissing the case without prejudice and allowing the 97 insureds to refile their claims "in the states where the alleged harm occurred." ECF No. 19-1 at PageID.724–32 (granting Defendant's motion "on the condition that the defendant waive any jurisdiction, statute of limitations, and forum non conveniens arguments, as to the claims asserted in the plaintiffs' Complaint, . . . . but the defendant is not required to waive . . . on any claims not asserted in plaintiffs' Complaint in this case"). On Plaintiffs' appeal, the Nevada Supreme Court upheld the conditions of the Nevada district court's order. *Allstate Fire & Cas. Ins. v. LSP Prod. Grp.*, 464 P.3d 123 (Nev. 2020) (unpublished table decision).

On September 16, 2020, Plaintiffs refiled their civil action in the Tenth Circuit Court of Michigan. ECF No. 1 at PageID.1; *see Liberty Ins. v. LSP Prods. Grp.*, 20-042811-NP (Mich. 10th Cir. Ct. filed Sept. 16, 2020). In Michigan, Plaintiff Cincinnati again alleges that the "plastic coupling nuts" on the water supply lines were defective and has therefore raised five claims: four tort claims and one contract claim for breach of implied warranty, each seeking the amount paid to Riverfront. ECF No. 18 at PageID.538–39; ECF No. 19 at PagID.679. Cincinnati's four tort

claims are (1) negligent design; (2) negligent manufacture; (3) negligent failure to warn or instruct; and (4) willful disregard of a known defect creating a substantial likelihood of injury. ECF No. 18 at PageID.541.

On October 20, 2020, Defendant filed a notice of removal to this Court under 28 U.S.C. § 1441(b). *See generally* ECF No. 1. In February 2021, Defendant filed a motion to sever and remand the claims of Plaintiff Liberty Insurance, which this Court denied in May 2021. ECF No. 9; *Liberty Ins.*, 2021 WL 2024897, at *2, *in* ECF No. 16.

In August 2021, Defendant filed a motion for summary judgment as to all Cincinnati's claims, which both parties have since fully briefed. ECF Nos. 18; 19; 20; 21.

**B.**

A motion for summary judgment should be granted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the initial burden of "identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence and draw all reasonable inferences in favor of the nonmovant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

The burden then shifts to the nonmovant, who must set out specific facts showing "a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250 (citation omitted). The nonmovant must show more than "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the "mere existence of a scintilla of

evidence" in support of the nonmovant does not establish a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252.

Summary judgment will be granted if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

In a diversity case like this, the court must apply "the substantive law of the state in which it sits," in this case of course, the law of the State of Michigan. *BP Expl. & Oil Co. v. Maint. Servs., Inc.*, 313 F.3d 936, 942 (6th Cir. 2002); *see also Standard Fire Ins. v. Ford Motor Co.*, 723 F.3d 690, 692–99 (6th Cir. 2013) (applying the *lex locus delicti* in an insurance subrogation action).

## II.

Defendant claims that the economic-loss doctrine bars Cincinnati's four tort claims.

### A.

Because "[t]he distinction between contract theory and tort theory can often be murky," Gary M. Victor, *The Economic Loss Doctrine and Consumers*, Mɪᴄʜ. Bᴀʀ J., Sept. 2010, at 23, 23, "[c]ourts developed the economic-loss doctrine to keep a clear line between tort and contract law, two common-law areas that serve distinct purposes," *Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*, 790 F. App'x 775, 777 (6th Cir. 2019) (unpublished) [hereinafter *Eagle Pond II*].

The point of the economic-loss doctrine, then, is to distinguish personal-injury claims from economic claims, not to altogether eliminate recovery for personal-injury claims. The economic-

loss doctrine is relevant here, because it "responds to the reality that one of these two bodies of law (tort) is not subject to the party's negotiations whereas the other one (contract) is." *Id.* at 778.

Notably, "Michigan courts have broadened the economic-loss doctrine beyond the 'paradigmatic' case of a buyer who contracts with a seller for a poor product and then seeks to use tort law to obtain a refund of the purchase price." *Id.*

According to the economic-loss doctrine, "[w]he[n] a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC." *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 618 (Mich. 1992). In this way, "the effect of [*Neibarger*] is to make the U.C.C. dominant in product liability controversies that do not involve personal injury." Vincent A. Wellman, *Assessing the Economic Loss Doctrine in Michigan: Making Sense Out of the Development of Law*, 54 WAYNE L. REV. 791, 803–04 (2008) ("Whe[n] a product proves to be faulty after the parties have contracted for sale and the only losses are economic, the policy considerations supporting products liability in tort [do not] encourage[e] the design and production of safer products."). Indeed, the Michigan Court of Appeals has clarified at least twice that the doctrine applies to only commercial transactions for goods. *See Farm Bureau Mut. v. Combustion Rsch. Corp.*, 662 N.W.2d 439, 442–43 (Mich. Ct. App. 2003); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 864 (Mich. Ct. App. 2002).

Bricking the wall between tort and contract, the economic-loss doctrine bars tort claims when "(1) the parties or others closely related to them had the opportunity to negotiate the terms of the sale of the good or product causing the injury, and (2) their economic expectations can be satisfied by contractual remedies." *Quest Diagnostics*, 656 N.W.2d at 863. Expansively, in Michigan, "[u]nlike some jurisdictions, the economic-loss doctrine applies . . . even when the

plaintiff is seeking to recover for property other than the product itself." *Citizens Ins. v. Osmose Wood Preserving, Inc.*, 585 N.W.2d 314, 316 (Mich. Ct. App. 1998) (citing *Neibarger*, 486 N.W.2d at 619).

**B.**

Defendant argues that this case "is factually indistinguishable from *Osmose Wood Preserving*." ECF No. 18 at PageID.549. Defendant contends that "the insureds were operating commercial enterprises, and the defendant manufacturer's product was incorporated into the building[, and] there were physical failures on the insured properties, causing damage to the buildings and personal property contained within, and for which the subrogee plaintiffs blamed the defendants' products." *Id.* at PageID549–50.

Cincinnati responds that "[t]he economic loss doctrine requires an underlying transaction, and an opportunity for the parties to consider the risks." ECF No. 19 at PageID.684. Cincinnati explains that "[i]n the case at hand, there is no identified transaction, and there was no opportunity for the parties to consider the risks." *Id.* at PageID.685. Cincinnati adds that for the economic-loss doctrine to apply, each transaction from Defendant to Riverfront, no matter how long the chain, must have been a verifiable commercial transaction. *See id.* at PageID.686–87. Cincinnati concludes that because "there is no evidence that all transactions bringing the Product to Plaintiff's insured were commercial. . . . the economic loss doctrine cannot apply." *Id.* at PageID.687.

Defendant replies that "the identity of the product's seller is irrelevant." ECF No. 20 at PageID.891. Defendant admits that it indeed "does not know specifically when, or from whom, Riverfront purchased the water supply line at issue." *Id.* at PageID.889. Defendant states that "[i]t is undisputable, however, that Riverfront ultimately acquired the water supply line through a series of transactions connecting Riverfront and [Defendant]." *Id.* at PageID.890 (citing Compl., ECF

No. 1 at PageID.15, 16, 20). "This is the obvious and necessary conclusion," Defendant claims, because Riverfront "purchased and installed" the water supply line for its commercial benefit. *Id.* Defendant concludes that "[w]hether a transaction is 'commercial' depends upon the purpose of the transaction, not the person or entity who sold the product." *Id.* at PageID.890–91 (citing *Crossing at Eagle Pond, LLC v. Lubrizol Corp.*, 346 F. Supp. 3d 1048, 1058–59 (E.D. Mich. 2018) [hereinafter *Eagle Pond I*], *aff'd*, *Eagle Pond II,* 790 F. App'x 775 (6th Cir. 2019) (unpublished)).

Cincinnati again reiterates that "all transactions that brought the product to the ultimate user must be commercial for the economic loss doctrine to apply." ECF No. 21 at PageID.904 (citing *Eagle Pond II*, 790 F. App'x at 780). Cincinnati concludes that this Court should deny Defendant's Motion for Summary Judgment, because "[i]t is entirely possible, that the product [might] have been originally purchased by an ordinary consumer for personal use, but then later used the product at [Riverfront]." *Id.* at PageID.904–05.

In a nutshell, the parties primarily dispute whether the water supply lines were part of a commercial transaction.

## C.

The economic-loss doctrine bars Cincinnati's four tort claims.

In applying Michigan's economic-loss doctrine, courts have had to go beyond the UCC to define "commercial transaction," because "nothing about Article 2 [of the UCC] addresses the distinction between commercial purchases and consumer purchases." Wellman, *supra*, 827–28. Indeed, the problem persists here: Were the water supply lines part of a commercial transaction?

In that form, the question is a red herring. The real question is: Drawing all inferences in the light most favorable to Cincinnati, was Riverfront a commercial enterprise that purchased the water supply lines and used them in a commercial setting? The answer is "Yes."

The economic-loss doctrine can apply even if Riverfront did not purchase the product from Defendant. Indeed, for the doctrine to apply, Riverfront simply had to have purchased the water supply lines for a commercial purpose; it does not matter whether the seller was the manufacturer or some third-party installer. What matters is that Cincinnati had "the opportunity to negotiate the terms and specifications, including warranties, disclaimers, and limitation of remedies." *Wellman*, *supra*, 802–03. With such an opportunity, "the consequences of the [water supply lines'] potential failure [would] likely . . . have been contemplated by [Riverfront] when [it] entered into the agreement for the sale," and the economic-loss doctrine would therefore apply. *Quest Diagnostics*, 656 N.W.2d at 862–63.

As the Sixth Circuit recently explained, "A long line of Michigan cases has applied the economic-loss doctrine to bar a commercial plaintiff's tort suit against a product manufacturer even though the plaintiff did not directly contract with the manufacturer." *Eagle Pond II*, 790 F. App'x at 778–79 (collecting cases). In those cases, though "'a series of commercial decisions and transactions' separated the commercial plaintiff from the commercial defendant[,] . . . the courts still rejected tort suits." *Id.* at 779 (internal citation omitted). Despite a break in the commercial-transaction chain, the Sixth Circuit applied the economic-loss doctrine "because the commercial plaintiff" could have "protect[ed] itself through 'ordinary contractual remedies,' even if those remedies r[a]n against an entity in the distribution chain other than the manufacturer itself." *Id.* (first quoting *Fed. Ins. v. Conbraco Indus.*, No. 274351, 2008 WL 1959059, at \*3 (Mich. Ct. App. May 6, 2008) (unpublished) (per curiam); and then citing *Rardin v. T & D Mach. Handling, Inc.*, 890 F.2d 24, 28 (7th Cir. 1989)).

Effectively addressing Cincinnati's primary argument in this case, the Sixth Circuit emphasized that "Michigan courts have not allowed a downstream commercial purchaser to avoid

- 8 -

the [economic-loss] doctrine merely because of 'the fortuity of a resale' of the product." *Id.* at 780 (quoting *Affiliated FM Ins. ex rel. Motor City Stamping v. Abolite Lighting, Inc.*, No. 193016, 1998 WL 1997669, at *9–10 (Mich. Ct. App. Mar. 20, 1998) (unpublished) (per curiam)). In this way, though the *Eagle Pond* cases involved a verifiable series of commercial transactions, such a verifiable series is not necessary for the economic-loss doctrine to apply. Instead, the crux of the economic-loss doctrine is whether the plaintiff was a commercial entity that purchased the allegedly defective product for a commercial purpose. *See Eagle Pond I*, 346 F. Supp. 3d at 1058.

As the Michigan Court of Appeals has explained, when the plaintiff "is a commercial enterprise that used the [product] in a commercial setting," its "losses are commercial losses that arise out of defendant's commercial sale of defective goods." *Motor City*, 1998 WL 1997669, at *9.

There is no doubt that Riverfront Medical Realty, LLC is a commercial enterprise. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 692 (2014) (stating that "for-profit corporations" are "commercial enterprises"); *see Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 436 (6th Cir. 2012) (defining "business" under the Michigan Medical Marihuana Act as "'commercial enterprise carried on and for profit,'" and "'commercial, industrial, or professional dealings'" or "'an affair or matter.'" (quoting *W. Town Line Assocs., LLC v. Mack & Meldrum Assocs.*, LLC, No. 288384, 2010 WL 785938, at *3 (Mich. Ct. App. Mar. 9, 2010) (unpublished) (per curiam))); *see also Duby v. Shirley May's Place*, LLC, No. 16-11443, 2017 WL 1021062, at *2, *3, *5 (E.D. Mich. Mar. 16, 2017) (defining "commercial enterprise" under the Federal Labor Standards Act); Joseph W. Yockey, *The Compliance Case for Social Enterprise*, 4 MICH. BUS. & ENTREPRENEURIAL L. REV. 1, 7 (2014) ("A social enterprise may organize as a corporation, a partnership, a cooperative, or an LLC.").

Further, Cincinnati does not dispute that Riverfront purchased the allegedly defective water supply lines in a commercial transaction. To that end, Cincinnati's damages claim plainly relies on the assumption that Riverfront, a commercial entity, purchased the water supply lines. *See* ECF No. 1 at PageID.17 ("[T]he water supply lines were defective for their intended, anticipated[,] and reasonably foreseeable use at the time of sale."). Indeed, in its Complaint, Cincinnati stated that the water supply lines caused harm "to Plaintiffs' Insureds' real and personal property." *Id.* at PageID.9. And Cincinnati acknowledged that "[a]t all times relevant hereto, Plaintiffs' Insureds owned and/or occupied the property where the loss occurred." *Id.*; *id.* at PageID.14 (same). In this way, Cincinnati has acknowledged that Riverfront owned the property at 1015 South Washington Avenue, Saginaw, Michigan 48601. *See id.* at PageID.29, 69.

Indeed, Saginaw Township's public records indicate that Riverfront purchased the parcel on February 13, 2002, meaning it owned the parcel when the alleged loss occurred on August 22, 2016. *Compare id.*, *with* Saginaw Area GIS Auth., *Parcel Report 08 0630 00000* (Dec. 19, 2021), https://app.fetchgis.com:8080/?url=http%3A%2F%2Flink.fetchgis.com%2F6408c34a&orientation=portrait&format=Letter&zoom=1&margin=13mm [https://perma.cc/HG35-W55B].

For these reasons, it requires no stretch of the imagination to reasonably conclude that Riverfront purchased the water supply lines in a commercial transaction—either when it purchased the property or after. To find otherwise would create a perverse incentive for commercial enterprises to throw their hands in the air or "lose" purchase records, blurring the line between contract and tort by circumventing the broad swath of Michigan's economic-loss doctrine. Here, "[t]here is no point in using the word '[]possible' to describe something that has clearly happened." DOUGLAS ADAMS, DIRK GENTLY'S HOLISTIC DETECTIVE AGENCY 159 (1987).

Stated bluntly, Riverfront purchased the water supply lines. At that time, it had the opportunity to negotiate any related warranties, disclaimers, and limitation of remedies. *See Quest Diagnostics*, 656 N.W.2d at 863. Cincinnati's assertion to the contrary is completely unreasonable.

Moreover, Cincinnati stated in its Complaint that Riverfront used the water supply lines for commercial purposes. Indeed, Cincinnati stated that "[a]t all times material hereto, DEFENDANT'S water supply lines were used for the intended, anticipated[,] and reasonably foreseeable use of such water supply lines." *See id.* at PageID.16. And Cincinnati elaborated that Riverfront is one of the "purchasers and users" who expected the water supply lines to "have a useful life equal to or greater than" what they "anticipated." *Id.* In this way, there is no genuine issue of material fact regarding whether Riverfront was a commercial enterprise that used the water supply lines to operate its business.

For these reasons, Riverfront was a commercial enterprise that purchased the water supply lines in a commercial transaction and used them for a commercial purpose. Accordingly, the economic-loss doctrine bars Cincinnati's four tort claims. *See A.C. Hoyle Co. v. Sperry Rand Corp.*, 340 N.W.2d 326, 329 (Mich. Ct. App. 1983) (per curiam) (holding that trial court properly dismissed buyer's cause of action for negligence, because both buyer and seller were commercial enterprises, buyer's claim based upon nonconforming goods arose out of contractual relationship, there was no allegation of personal injury or damage to any property other than subject goods themselves, and UCC provisions were applicable to settle dispute). Consequently, Defendant's Motion for Summary Judgment will be granted as to Counts 1, 2, 3, and 5.

**D.**

As an ancillary matter, Cincinnati argues that the economic-loss doctrine is an affirmative defense. ECF No. 19 at PageID.683 (citing *Pavlovich v. Arbor Drugs, Inc.*, No. 223087, 2002 WL

991726, at *2 (Mich. Ct. App. May 10, 2002) (unpublished) (per curiam)). According to Cincinnati, Defendant waived the economic-loss doctrine by not raising the doctrine in its Answer to Cincinnati's Complaint. *Id.* at PageID.681 (citing *Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546, 550 (6th Cir. 2005)).

Defendant responds that "the Michigan Court of Appeals has subsequently recognized that the economic loss doctrine is not an affirmative defense that must be asserted in a defendant's responsive pleading." ECF No. 20 at PageID.891–92 n.1 (citing *Woods v. RE Inv., Inc.*, No. 338139, 2018 WL 4036539, at *3 (Mich. Ct. App. Aug. 23, 2018) (unpublished) (per curiam)).

Contrary to Cincinnati's assertion, the *Pavlovich* court specifically chose not to address the economic-loss doctrine because "the plaintiffs . . . both abandoned and waived this issue." *See Pavlovich*, 2002 WL 991726, at *2 n.2. And *Old Line* emphasized that trial courts must carefully consider whether finding waiver of an affirmative defense "is appropriate in light of the applicable jurisprudence and the facts and circumstances of this case," because "failure to plead an affirmative defense does not always result in waiver." *Old Line*, 418 F.3d at 550 (first citing *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir.1997); and then citing *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir.1993)).

Cincinnati's assertion is incorrect under the Federal Rules and Michigan Rules. In this Court, Federal Rule of Civil Procedure 8(c) governs Cincinnati's waiver argument. *See* FED. R. CIV. P. 8(c). According to the Supreme Court, the purpose of Federal Rule of Civil Procedure 8(c) "is to give the opposing party notice of the affirmative defense and a chance to rebut it." *Coffey*, 992 F.2d at 1445 (citing *Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)); *Sushka*, 117 F.3d at 969 (same). As discussed, Cincinnati has twice briefed this issue. *See supra* Section II.B. Moreover, under the Michigan Court Rules, the economic-loss doctrine is not

an affirmative defense that can be waived by not raising it. *See Woods*, 2018 WL 4036539, at *3 (holding that "the circuit court did not clearly or obviously err by failing to conclude that the economic loss doctrine was an affirmative defense that defendants were required to state in their first responsive pleading," because "[t]he economic loss doctrine is not listed in MCR 2.111(F)(3)(a), and we have not identified any caselaw that supports plaintiff's position," which was "that the economic loss doctrine is an affirmative defense that a defendant must state in a responsive pleading").

For these reasons, Defendant did not waive its argument that the economic-loss doctrine bars Cincinnati's four tort claims.

### III.

Defendant also claims that the four-year statute of limitations in Michigan's Uniform Commercial Code bars Cincinnati's claim for breach of implied warranty. ECF No. 3 at PageID.132; ECF No. 18 at PageID.550–52.

### A.

Defendant contends that Michigan Compiled Laws § 440.2725 establishes a four-year statute of limitations for "warranty claims." ECF No. 18 at PageID.550, 551. Defendant elaborates that the statute of limitations accrues from "when delivery of products is made (not when the damage results), unless extended by express warranty." *Id.* Defendant explains that the statute of limitations accrued by 2010 at the latest, which is "the last time that the water supply lines could have been 'deliver[ed]' by [Defendant]." *Id.* In this way, Defendant concludes, Cincinnati's warranty claim is barred because it "first filed its claims . . . on April 12, 2018," but it needed to file before 2015. *Id.* at 552.

Cincinnati responds that the Nevada court's order of dismissal for forum non conveniens bars Defendant's statute-of-limitations defense. ECF No. 19 at PageID.689–92. According to Cincinnati, "[t]his Court must enforce the Nevada order under the Full Faith and Credit Clause Act," 28 U.S.C. § 1738. *Id.* at PageID.690–91. Under that Act, Cincinnati explains, "a federal court is required to give a state-court judgment the same preclusive effect that it would have under [Nevada] law." *Id.* at PageID.691. Applying "Nevada rules of preclusion," Cincinnati declares that "the issue is identical[,] . . . . the ruling was on the merits and is final and undisturbed[, and] the party against who res judicata is being applied is the same." *Id.* at PageID.691–92. For the same reasons, Cincinnati claims that "issue preclusion" also applies. *Id.*

Defendant replies that it "did not wave a statute of limitations defense that had already run." ECF No. 20 at PageID.894–95. Defendant adds that this Court should not credit the Nevada court's order, because it "was standard issue for dismissal due to forum non conveniens." *Id.* at PageID.894. Even so, Defendant contends, "the Nevada court concluded Cincinnati's claims would be adjudicated under Michigan law." *Id.* at PageID.895. Defendant concludes that, as such, "the same statute of limitations would have been applied in Nevada, and Cincinnati's claims would have been time-barred there, too." *Id.* In this way, Defendant exhales, "Cincinnati's waiver argument is meritless." *Id.*

**B.**

Michigan law governs the statute-of-limitations issue. *See Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945). The statute of limitations for Cincinnati's breach of warranty claim is four years. *Safeco Ins. Co. of Am. v. CPI Plastics Grp.*, 625 F. Supp. 2d 508, 521 (E.D. Mich. 2008) (citing MICH. COMP. LAWS § 440.2725(1)).

Although Michigan law sets the length of the statute of limitations, federal law establishes when the statute of limitations begins to run. *Martello v. Santana*, 713 F.3d 309, 314 (6th Cir. 2013) (citing *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408–09 (6th Cir. 2010) (per curiam)). For a breach of warranty case, if the alleged warranty does not "explicitly extend to future performance," the statute of limitations "accrue[s] upon tender of delivery." *Snyder v. Bos. Whaler, Inc.*, 892 F. Supp. 955, 959 (W.D. Mich. 1994); *see also Safeco Ins.*, 625 F. Supp. 2d at 521–22 (first citing MICH. COMP. LAWS § 440.2725(2); and then citing *Rembrandt Constr. v. Butler Mfg.*, No. 270577, 2006 WL 3375249, at *2 (Mich. Ct. App. Nov. 21, 2006) (unpublished) (per curiam)) (other citations omitted).

Following the command to draw all reasonable inferences in Cincinnati's favor, this Court will apply the latest date of sale the parties offer. Cincinnati contends that "the date of delivery to [Riverfront] is unknown," ECF No. 19 at PageID.689, because "there is no identified transaction," *id.* at PageID.685. That is simply not true, as Riverfront purchased the parcel on February 13, 2002, before Defendant manufactured the water supply lines in 2009 and then sold them in 2009 or 2010. *Compare Parcel Report 08 0630 00000*, *supra* Section II.C, *with* ECF No. 18 at PageID.653. And it is not reasonable to infer that a sneaky plumber shut off Riverfront's water, disconnected its pipes, and then installed the supply lines on its property without its awareness or permission. Even if this Court were to engage in such magical thinking, Cincinnati has offered neither a possible gift nor a possible transaction. But Defendant has. *See* ECF No. 18 at PageID.653 (stating that Defendant likely "sold the toilet supply line in 2009 or 2010"). In this way, there is no *genuine* issue of material fact regarding the date of delivery.

Consequently, the statute of limitations for Cincinnati's breach of implied warranty claim expired on December 31, 2014. Cincinnati first raised the warranty claim on April 12, 2018, ECF

No. 19 at PageID.680, and then again on September 16, 2020, ECF No. 1 at PageID.1. Consequently, the statute of limitations has expired for Cincinnati's warranty claim. Similarly, as Defendant concluded, Cincinnati's warranty claim would have been time-barred in Nevada as well. ECF No. 20 at PageID.894–95

Yet Cincinnati contends that Defendant has waived its statute-of-limitations argument. According to Cincinnati, the Nevada district court granted Defendant's motion to dismiss for forum non conveniens on the express condition that Defendant waived any statute-of-limitations arguments for any claims Cincinnati raised in its initial complaint. ECF No. 19-1 at PageID.724–30, 732. Although the parties did not submit the initial complaint from the Nevada district court, Cincinnati raised the warranty claim in its complaint to the Michigan circuit court. ECF No. 1 at PageID.24–26. Drawing all reasonable inferences in favor of Cincinnati, the nonmoving party, this Court presumes Cincinnati raised the warranty claim in its initial complaint in the Nevada court.

Generally, courts must give full faith and credit to a judgment from another state, even if "the original suit on which it was based arose in the state of the forum and was barred there by the Statute of Limitations when the judgment was rendered." *Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268, 277 (1935) (first citing *Christmas v. Russell*, 72 U.S. 290, 301 (1866); and then citing *Roche v. McDonald*, 275 U.S. 449, 454–55 (1928)). Indeed, under 28 U.S.C. § 1738,[1] federal courts must give the judgment "the same preclusive effect it would have under the law of the state whose court issued the judgment." *Heyliger v. State Univ. & Cmty. Coll. Sys. of Tenn.*, 126 F.3d

---

[1] Section 1738 provides in pertinent part:

> The records and judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State . . . from which they are taken.

28 U.S.C. § 1738.

849, 851–52 (6th Cir. 1997) (first citing *Migra v. Warren City Sch. Dist.*, 465 U.S. 75, 81 (1984);

and then citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980)); *see also CHKRS, LLC v. City of Dublin*,

984 F.3d 483, 490 (6th Cir. 2021) (same).

For these reasons, this Court must give the Nevada judgment the same preclusive effect

that Nevada courts would give to an out-of-state judgment dismissing a case for forum non

conveniens.[2]

C.

In Nevada, res judicata—specifically, the distinction between claim preclusion and issue

preclusion—has confused many lawyers and law students. Ethan J. Birnberg, Special Feature,

*Nevada Adopts the Doctrines of Claim Preclusion and Issue Preclusion*, Nev. Law., Apr. 2010,

at 10, 10. For that reason, the Nevada Supreme Court went to great lengths to clarify the confusion

in *Five Star Capital Corp. v. Ruby*, 194 P.3d 709 (Nev. 2008), *holding modified by Weddell v.*

*Sharp*, 350 P.3d 80 (Nev. 2015).

i.

---

[2] Even if analyzed under Michigan preclusion law, the outcome would be the same. Michigan law presumes that judgments of other states are "valid and entitled to recognition" under the Full Faith and Credit Clause. *Nightwatch Cap. Grp. v. Questor Mgmt. Co.*, No. 299378, 2011 WL 6268198, at *3 (Mich. Ct. App. Dec. 15, 2011) (per curiam) (citing *Hare v. Starr Commonwealth Corp.*, 813 N.W.2d 752, 755 (Mich. Ct. App. 2011)); *see also LME v. ARS*, 680 NW2d 902, 910 (Mich. Ct. App. 2004) ("The purpose of the Full Faith and Credit Clause 'is to prevent the litigation of issues in one state that have been decided in another state.'" quoting *Martino v. Cottman Transmission Sys., Inc.*, 554 N.W.2d 17, 20 (Mich. Ct. App. 1996)). Under Michigan law, the Nevada judgment is a "foreign judgment." *Blackburne & Brown Mortg. Co. v. Ziomek*, 692 N.W.2d 388, 392 (Mich. Ct. App. 2004) (citing Mich. Comp. Laws § 691.1172). As such, in the Michigan courts, the Nevada judgment would "be given the same effect that it has in the state of its rendition." *Id.* (citing *Jones v. State Farm Mut. Auto. Ins.*, 509 N.W.2d 829, 836 (1993)). Accordingly, whether through federal law or Michigan law, this Court must apply Nevada preclusion law.

Cincinnati asserts that issue preclusion bars Defendant's statute-of-limitations defense under the Nevada judgment. ECF No. 19 at PageID.692. In *Five Star*, the Nevada Supreme Court set forth the following standard for issue preclusion:

> "(1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; . . . (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation"; and (4) the issue was actually and necessarily litigated.

*Five Star*, 194 P.3d at 713 (quoting *Univ. of Nev. v. Tarkanian*, 879 P.2d 1180, 1191 (Nev. 1994) (omission in original)).

The parties did not litigate the statute-of-limitations issue in the Nevada state court. *See generally* ECF No. 19-1 at PageID.724–32. For that reason, Nevada courts would not give the judgment preclusive effect. Accordingly, issue preclusion does not bar Defendant's statute-of-limitations defense.

**ii.**

Similarly, the *Five Star* court provided the following standard for claim preclusion:

> (1) the parties or their privies are the same, (2) the final judgment is valid, and (3) the subsequent action is based on the same claims or any part of them that were or could have been brought in the first case.

*Five Star*, 194 P.3d at 713 (footnotes omitted). The second element mirrors the second element of issue preclusion, so the following analysis applies to Cincinnati's issue-preclusion argument, too.

The parties in the Nevada and Michigan cases are the same, as are the claims in both cases. No doubt, the judgment is "final." *See Pan v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 88 P.3d 840, 841 n.6 (Nev. 2004) (citing *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1285 (11th Cir. 2001)). *But cf. Arangure v. Whitaker*, 911 F.3d 333, 347 (6th Cir. 2018) ("What really matters is the effect of the judgment. And, critically here, a judgment dismissing a case 'without prejudice'

is not truly 'final.'"). Therefore, the only remaining issue is whether the Nevada judgment is "valid." In other words, under Nevada law, would a judgment dismissing a case for forum non conveniens receive preclusive effect?

Nevada Rule of Civil Procedure 41(b) expressly states that an order of dismissal "not provided for in this rule" is an adjudication on the merits unless the basis for dismissal is lack of jurisdiction, improper venue, or failure to join a party. NEV. R. CIV. P. 41(b).

Interpreting the Nevada Rules, the *Five Star* court emphasized that Nevada courts should not give preclusive effect to judgments on issues of jurisdiction or venue. *Five Star*, 194 P.3d at 713 n.27 ("[T]he requirement of a valid final judgment . . . does not include a case that was dismissed without prejudice or for some reason (jurisdiction, venue, failure to join a party) that is not meant to have preclusive effect." (first citing 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, § 131.30[3][a] (3d ed. 2008); then citing RESTATEMENT (SECOND) OF JUDGMENTS § 19 cmt. A, § 20 (AM. L. INST. 1982); and then citing NEV. R. CIV. P. 41(b))).

Indeed, for nearly a century, Nevada courts have refused to give preclusive effect to judgments dismissing claims on jurisdictional grounds—albeit under a different name. *See, e.g.*, *Sugarman Iron & Metal Co. v. Morse Bros. Mach. & Supply Co.*, 255 P. 1010, 1013 (Nev. 1927) (holding that trial court's judgment granting defendant's motion to dismiss for "want of jurisdiction" did not receive preclusive effect, as it "determined merely a jurisdictional question and not whether the facts sufficient were stated to constitute a cause of action").

Forum non conveniens is a cousin of the doctrines related to jurisdiction and venue. *See Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653, 658 (6th Cir. 2021) ("[T]he district court's power to dismiss a case on forum non conveniens grounds is rooted in the reality that 'a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general

venue statute.'" (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947)); *see also Gulf Oil*, 330 U.S. at 504 ("Indeed the doctrine of forum non conveniens can never apply if there is absence of jurisdiction or mistake of venue."); *Forum non conveniens*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The doctrine that an appropriate forum . . . may divest itself of jurisdiction if, for the convenience of the litigants and the witnesses, it appears that the action should proceed in another forum in which the action might also have been properly brought in the first place."); Paul A. Hoversten, Note, *Punishment but Not a Penalty? Punitive Damages Are Impermissible Under Foreign Substantive Law*, 116 MICH. L. REV. 759, 779–84 (2018) (discussing the jurisdictional implications of dismissals for forum non conveniens in the context of punitive damages). But cousinry might not be enough.

Assuming *arguendo* that dismissals for forum non conveniens do not fall under the wingspan of jurisdiction or venue, the Ninth Circuit has since interpreted *Five Star* to hold that dismissals without prejudice are not preclusive. *Matter of R&S St. Rose Lenders, LLC*, 748 F. App'x 753, 760 (9th Cir. 2018). The Ninth Circuit added that Nevada Rule of Civil Procedure 41(a)(2) states that "[u]nless otherwise specified in the order, a dismissal [by order of the court] is without prejudice." *Id.* And more recently, the Southern District of New York applied *Five Star* to a Nevada judgment to hold the same. *See Biragov v. Dreamdealers USA, LLC*, No. 21 CIV. 483 (JPC), 2021 WL 5303918, at *3–5 (S.D.N.Y. Nov. 15, 2021) ("The Court therefore holds that a *res judicata* dismissal is a non-merits dismissal.").

In this case, the Nevada judgment does not specify that it is with prejudice. *See generally* ECF No. 19-1 at PageID.724–32. Therefore, the Nevada judgment is a dismissal without prejudice.

*In re R&S St. Rose Lenders, LLC*, 748 F. App'x 753, 760 (9th Cir. 2018) (unpublished); *Five Star*, 194 P.3d at 713 n.27.[3]

     Because the Nevada judgment dismissed Cincinnati's claims without prejudice, Nevada courts would not give it preclusive effect. Therefore, Michigan courts would also not give it preclusive effect. For these reasons, this Court will not give the Nevada judgment preclusive effect.

     Consequently, Michigan's four-year statute of limitations applies, barring Cincinnati's claim for breach of implied warranty. *See* MICH. COMP. LAWS § 440.2725(1). Defendant's Motion for Summary Judgment will be granted, Cincinnati's claims against Defendant will be dismissed, and Cincinnati will no longer be a party to this case.

## IV.

     Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 18, is **GRANTED**. All Cincinnati's claims against Defendant are dismissed, and Plaintiff Liberty Insurance's claims remain. Consequently, Cincinnati is no longer a party to this case.

Dated: January 3, 2022
                         s/Thomas L. Ludington
                         THOMAS L. LUDINGTON
                         United States District Judge

---

[3] In addition, the Nevada judgment does not substantively preclude Defendant's statute-of-limitations defense. Although the Nevada judgment, by its plain language, indicates that Defendant must waive all statute-of-limitations defenses, such a blind-eye reading ignores the judgment's practical effect. Even if the statute of limitations had expired when the Nevada court dismissed the case, Cincinnati's reading of the Nevada judgment would require Defendant to give up a defense that the Nevada court did not address on the merits (i.e., the statute of limitations) in exchange for a voluntary dismissal to a forum that is more convenient for Plaintiffs. A more reasonable reading of the condition for Defendant to "waive any . . . statute of limitations . . . arguments, as to the claims asserted in the plaintiffs' Complaint," is that the Nevada judgment merely tolled the statute of limitations to ensure Plaintiffs had ample time to refile their claims in response to the involuntary dismissal. *See* ECF No. 19-1 at PageID.729 (cleaned up). Supporting the latter reading, the Nevada district court modified the judgment to add a 90-day limit on Plaintiffs' ability to refile. *See id.* at PageID.732.